**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Ex rel.* Crystal McKinsey | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-cv-20528-WJM-AME |
| | ) | |
| Lab Elite, LLC, | ) | |
| LabCo Elite, LLC | ) | |
| Healthcare Development Partners, LLC, | ) | |
| HDP Labs, LLC, | ) | |
| Lab Dash, LLC, | ) | |
| Grand River Investments, LLC | ) | |
| Bob Transportation and Taxi, Inc., | ) | |
| Nikola Nozinic, | ) | |
| Zishan Alvi, | ) | |
| Todd Bryant, | ) | |
| Roxanne Scavone, | ) | |
| Babar Nasim, and | ) | |
| Moin Babar. | ) | |

**RELATOR'S FIRST AMENDED *QUI TAM* COMPLAINT**

Relator, Crystal McKinsey, files this First Amended *Qui Tam* Complaint on behalf of the United States of America against Lab Elite, LLC, LabCo Elite, LLC, Healthcare Development Partners, LLC, HDP Labs, LLC, Lab Dash, LLC, Grand River Investments, LLC, Bob Transportation and Taxi, Inc., Nikola Nozinic, Zishan Alvi, Todd Bryant, Roxanne Scavone, Babar Nasim, and Moin Babar (the "Defendants") pursuant to 31 U.S.C. §§ 3729 *et seq.* (the "FCA"). Defendants submitted and caused the submission of false claims to the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured (the "Uninsured Program") which was administered by the Health Resources and Services Administration ("HRSA") of the Department of Health and Human Services ("HHS").

## I.       Introduction

1.    From November 2020 to February of 2022, Defendants conspired to submit false claims to the HRSA Uninsured Program: (i) for laboratory tests provided to patients who had insurance and thus were not eligible for reimbursement under the HRSA Uninsured Program, (ii) for tests that were never performed; and (iii) for tests resulting from the payment of illegal kickbacks made in violation of the federal Anti-Kickback Statute. Because of the false claims that Defendants caused to be submitted, the HRSA Uninsured Program paid Defendant Lab Elite $83,578,387.89.

2.    During the Covid-19 Public Health Emergency, Congress appropriated funds to reimburse laboratories for testing performed on uninsured individuals. These funds were dispersed by HRSA under its Uninsured Program. The Uninsured Program operated until March 22, 2022, when it stopped accepting claims due to a lack of sufficient funds.

3.    Defendants diverted funds set aside for the testing and care of uninsured individuals by targeting major companies with large, insured employee populations and presenting them with an offer that was too good to be true: Defendants offered to provide free Covid testing to all of the companies' employees every week. There would be no charge to the company, no charge to the employees, and no charge to the employees' insurance.

4.    This last guarantee – that there would be no charge to the patient's insurance – was particularly important to employers who operated self-funded insurance plans for their employees, because those employers were financially responsible for any claims made under the policy. Defendants guaranteed free testing and, in exchange, employers provided Defendants with a massive number of patients who were required to receive weekly testing as a condition of their employment.

5. Defendants attempted to conceal from their corporate clients that reimbursement was obtained from the HRSA Uninsured Program. Defendants acknowledged federal funding but misrepresented the fundamental nature of the HRSA Uninsured Program, describing it as "the US Department of Health and Human Services ('HHS') claim reimbursement program to health care providers at Medicare rates." Defendants carefully and consistently avoided providing the name of the federal program funding their operations or acknowledging that the funds they received had been set aside to reimburse the care of uninsured individuals.

6. In reality, Defendants submitted virtually all claims for reimbursement from the HRSA Uninsured Program. Between November 2020 and February 2022, approximately 97.9% of all money received by Defendant Lab Elite came from the HRSA Uninsured Program.

7. Defendants' plan was fundamentally unsound – the employees they were testing did not qualify for reimbursement under the HRSA Uninsured Program. To secure payment from the HRSA Uninsured Program, Defendants were required to make several attestations. One of these mandatory attestations was the following: "I attest that I have checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage …." The Uninsured Program was explicitly and unambiguously not intended for the benefit of Defendants' employer clients. Nonetheless, Defendants made and caused this attestation to be made for each batch of claims submitted, knowing that it was false.

8. Defendants did not simply fail to confirm that the patient was uninsured; they affirmatively knew the insurance status of the employees they tested. Prior to accepting specimens from an employer for testing, Defendants contracted with the employer for the provision of laboratory services. While negotiating this contract, Defendants extensively discussed the insurance status of the employer-client's employees. Defendants frequently discussed the importance to clients of

avoiding the submission of claims to the employees' insurance. Defendants encouraged patients not to provide insurance information in filling out test forms, and, internally, discussed the critical importance of not putting this instruction in writing.

9. Despite Defendants' efforts at concealment, some clients discovered the true source of Defendants' funding and explicitly warned Defendants that their billing practices were improper, with unambiguous statements such as "we are not at liberty to submit for reimbursement from the Cares Act" and "there is no reimbursement from the HHS to an employer group plan."

10. Defendants ignored these warnings. They did not attempt to comply with federal law and instead focused on avoiding detection, reassuring each other that "saying no insurance is not going to raise a red flag. There's millions of tests getting billed this way." In this manner, Defendants submitted millions of false claims to the HRSA Uninsured Program and diverted millions of dollars from the testing and treatment of the uninsured.

11. By at least as early as the March of 2021, Defendants came to a critical realization – that actually processing all of the Covid tests they billed to the HRSA Uninsured Program was pointless. The vast majority of Defendants' patients were not sick. They had no Covid symptoms and no known exposure. They were only being tested because Defendants' employer-clients required it. Defendants were testing entire populations of apparently healthy employees every week. As a result, Defendants could identify a large subset of their patient population that was very unlikely to test positive: if an individual employee tested negative last week, and their coworkers tested negative last week, and they are not reporting Covid symptoms this week or any suspected exposure, it is incredibly likely that they will test negative again this week. In those instances, Defendants determined that they could collect the specimen, throw it away without ever running the test, bill the test, and report that the patient's test results were negative without

incurring substantial additional risk: (i) neither the company nor the employee was likely to notice; (ii) even with a large number of fake results, the aggregate effect on the error rate was likely to be small; and (iii) the resulting claims were already fraudulent anyway because the Defendants knew that the patients were ineligible under the Uninsured Program.

12. Defendant Alvi has subsequently pleaded guilty to this conduct. On September 30, 2024, Defendant Alvi admitted to instructing a co-conspirator "to bill HRSA for specimens that defendant knew were not processed and had been thrown away by [Lab Elite] employees …." *United States v. Alvi*, 1:23-cr-00142, ECF No. 64, p. 4 (Sep. 30, 2024). Similarly, Defendant Zishan Alvi admitted that, over a period of less than three weeks in December of 2021, he "billed HRSA for approximately 85,066 unprocessed tests." *Id.* at 5. Defendant Zishan Alvi "acknowledge[d] that, as a result of the scheme, HRSA paid at least approximately $14 million to [Defendant Lab Elite] for COVID-19 tests that were not performed as billed." *Id*. Other Defendants assisted Defendant Zishan Alvi in concealing the fact that many tests were being reported and billed to the HRSA Uninsured Program without ever being performed.

13. Defendants knew that the claims they submitted and caused to be submitted were false and fraudulent, but they went along with the scheme because they received massive illegal kickbacks to do so: between November of 2020 and January of 2022, the HRSA Uninsured Program paid Defendant Lab Elite $83,578,387.89, and Defendant Zishan Alvi and Defendant Todd Bryant caused Defendant Lab Elite to pay significant portions of those proceeds as kickbacks to the other Defendants.

14. Defendant Todd Bryant attempted to recruit Relator to join the conspiracy, and he repeatedly emphasized his willingness to pay kickbacks. In November of 2021, he sent Relator a photograph of a photo of a check for $390,805.00 and left a voicemail message stating the

following "Hey Crystal. Todd Bryant. That check is for a taxi driver … and that was a check for one week, last week, he made four hundred grand in one week, making a million five, so I want to talk to you about it and, you know we've got to do everything, but there is never going to be an easier time to make money. Call me back …."  When Relator questioned Defendant Todd Bryant about her compliance concerns, he made his prioritization of profits over legal compliance very clear stating, "this is sort of a gold rush …  it's a little bit of the wild west, but that's how fortunes are made."

15. Defendants recklessly profiteered off of the Covid-19 Public Health Emergency. Not only did they divert funds that were needed to support legitimate testing of the uninsured, but they told patients that they did not have Covid without performing the tests to know whether that was true. Some of those patients actually were sick, and Defendants' misconduct made them less likely to self-quarantine and more likely to infect others.

## II.   Jurisdiction and Venue

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1345, and 31 U.S.C. § 3730(b). This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

17. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because one or more of the Defendants transact or have transacted business in this Judicial District and one or more acts proscribed by 31 U.S.C. § 3729 occurred in this Judicial District.

18. Relator made all necessary voluntary disclosures to the government prior to filing this lawsuit and have filed all documents necessary with the United States Government as required by 31 U.S.C. § 3730(b)(2).

19. No public disclosure of the allegations or transactions in this Complaint occurred prior to the filing of Relator's original Complaint in this matter, and, moreover, Relator would qualify as and is an "original source" of the allegations in this Complaint under 31 U.S.C. § 3730(e) even if such public disclosure had occurred.

### III.   Parties

### Defendants

20. Lab Elite, LLC is an Illinois limited liability company with its principal place of business at 5824 N. Northwest Highway Chicago, IL. The registered agent of Lab Elite, LLC is Nikola Nozinic located at 5820 N. Northwest Highway Chicago, IL. Lab Elite, LLC was dissolved on April 12, 2024.

21. LabCo Elite, LLC is an Illinois limited liability company with its principal place of business at 1000 South Rose Avenue, Park Ridge, IL 60068. The registered agent of LabCo Elite, LLC is Todd Bryant with a listed address of 1000 South Rose Avenue, Park Ridge, IL 60068. However, this address is the residence of Defendant Nikola Nozinic, not Defendant Todd Bryant. LabCo Elite, LLC was dissolved on May 10, 2024.

22. Healthcare Development Partners, LLC is an Illinois limited liability company with its principal place of business at 120 W. Madison Street #200-9, Chicago, IL 60602. The registered agent of Healthcare Development Partners, LLC is Marsha Loyfman located at 65 Aspen Ln, Glencoe, IL 60022.

23. HDP Labs, LLC is an Illinois limited liability company with its principal place of business at 1000 South Rose Avenue, Park Ridge, IL 60068. The registered agent of HDP Labs, LLC is Todd Bryant with a listed address of 1000 South Rose Avenue, Park Ridge, IL 60068. However,

this address is the residence of Defendant Nikola Nozinic, not Defendant Todd Bryant. HDP Labs, LLC was dissolved on February 10, 2023.

24. Lab Dash, LLC is an Illinois limited liability company with its principal place of business at 1000 South Rose Avenue, Park Ridge, IL 60068. The registered agent of Lab Dash, LLC is Todd Bryant located at 1000 South Rose Avenue, Park Ridge, IL 60068. However, this address is the residence of Defendant Nikola Nozinic, not Defendant Todd Bryant. Lab Dash, LLC was dissolved on February 10, 2023.

25. Grand River Investments, LLC is a Delaware limited liability company with its principal place of business at 1000 South Rose Avenue, Park Ridge, IL. Grand River Investments, LLC has failed to maintain a registered agent in Delaware or Illinois.

26. Bob Transportation and Taxi, Inc. is an Illinois corporation with its principal place of business at 2358 Hassell Rd, Ste I J, Hoffman Estates, IL. The registered agent of Bob Transportation and Taxi, Inc. is Moin Babar located at 2358 Hassell Rd, Ste I J, Hoffman Estates, IL. Bob Transportation and Taxi, Inc. was dissolved on June 13, 2025.

27. Nikola Nozinic is an individual resident of Illinois residing at 1000 South Rose Avenue, Park Ridge, IL, 60068.

28. Zishan Alvi is an individual resident of Illinois incarcerated at Terre Haute FCI, Register Number 48434-510.

29. Todd Bryant is an individual resident of Illinois residing at 65 Aspen Ln, Glencoe, IL 60022.

30. Roxanne Scavone is an individual resident of Illinois residing at 18W 135 Belair Ct, Darien, IL 60561.

31. Babar Nasim is an individual resident of Illinois residing at 37100 Bonnie Brae Road, Lake Villa, IL 60046.

32. Moin Babar is an individual resident of Illinois residing at 37100 Bonnie Brae Road, Lake Villa, IL 60046.

### Relator

33. Relator, Crystal McKinsey, is an individual resident of Michigan residing at 2232 South Main #543, Ann Arbor, MI, 48103. Relator owned and operated McKinsey CMO Group, LLC which was a contractor of Lab Dash, LLC.

### Plaintiff

34. The real party in interest to the FCA *qui tam* claims herein is the United States of America.

### IV.    Legal Framework

#### A. The COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program

35. As authorized by the Families First Coronavirus Response Act, the Paycheck Protection Program and Health Care Enhancement Act, the Coronavirus Aid, Relief, and Economic Security Act, and the Coronavirus Response and Relief Supplemental Appropriations Act, the Health Resources and Services Administration ("HRSA") of the U.S. Department of Health and Human Services ("HHS") established the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program (commonly referred to as the "Uninsured Program") to provide claims reimbursement to health care providers for services provided to uninsured individuals using federal funds from the Public Health and Social Services Emergency Fund, as appropriated in Public Law 116-136, Public Law 116-139, and Public Law 116-260, in addition to funds appropriated in Public Law 177-2. On

March 22, 2022, the HRSA Uninsured Program stopped accepting claims due to a lack of sufficient funds.

36. As the name suggests, the Uninsured Program was intended exclusively to provide reimbursement for services provided to uninsured patients. Providers were not entitled to submit claims for reimbursement to the Uninsured Program for services provided to insured patients. This limitation was very prominently displayed: It is in the name of the program. It is on the HRSA Uninsured Program website in multiple locations, in HRSA's Patient Fact Sheet, in HRSA's Provider fact sheet, and in the Uninsured Program Frequently Asked Questions. Providers submitted claims for reimbursement from the HRSA Uninsured Program in batches, by uploading one or more data files to HRSA's online portal, which each consisted of multiple claims. With each submission, providers were required to make the following attestation which applied to every claim in the batch: "I have checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage, Medicare or Medicaid and that no other payer will reimburse for Covid-19 testing or care for the patient." Furthermore, providers were required to attest that all claims in each batch were for Covid-19 testing or care provided in compliance with the Uninsured Program's Terms and Conditions. Pursuant to these Terms and Conditions, each provider certified that:

- "To the best of its knowledge, the patients identified on the claim form were Uninsured Individuals at the time the services were provided"; and

- "All information it provides as part of its application for the Payment, as well as all information and reports relating to the Payment that it provides in the future at the request of the Secretary or Inspector General, are true, accurate and complete, to the best of its knowledge."

37. UnitedHealth Group, which contracted with HRSA to support the administration of the Uninsured Program, implemented procedures to verify the eligibility of claims submitted under the Uninsured Program and to ensure that Uninsured Program funds were not used to reimburse

services provided to insured patients. UnitedHealth Group requires providers to include either the SSN and state of residence or a driver's license or other state ID in order to facilitate this verification. In the event that this information was not available, the provider must further attest that it attempted to capture this information before submitting a claim or that it did not have an opportunity to attempt to capture this information. Providers cannot receive payment under the Uninsured Program without making these attestations.

38. Providers submitting claims for Uninsured Program reimbursement also attested that they had and will comply with all "applicable statutes and regulations." Such applicable statutes include the Anti-Kickback Statute.

### B.  The Anti-Kickback Statute

39. The Anti-Kickback Statute, 42 U.S.C. 1320a-7b(b) (the "AKS") arose out of congressional concern that payments to those in a position to influence health care decisions would result in the provision of goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect patients and federal healthcare programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.

40. The AKS prohibits persons from offering, paying, soliciting, or receiving illegal remunerations in return for referrals or "in return for… arranging for or recommending purchasing, leasing, or ordering any good … or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. §§ 1320a-7b(b)(1)(B) and (2)(B).

41. The Uninsured Program is a federal health care program as defined under 42 U.S.C. § 1320a-7b(f).

42. Violation of the AKS is a felony and punishable by fines and imprisonment, and can also result in exclusion from participation in federal health care programs. 42 U.S.C. § 1320a-7b(b)(2)

and 42 U.S.C. § 1320a-7(b)(7). Furthermore, claims procured by violations of the AKS are false under the FCA. 42 U.S.C. § 1320a-7b(g) ("A claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA].").

### C. The False Claims Act

43. The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986). As relevant here, the FCA establishes treble damages liability to the United States for an individual or entity that:

   a. "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A);

   b. "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B);

   c. "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)," 31 U.S.C. § 3729(a)(1)(C);

   d. "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property," 31 U.S.C. § 3729(a)(1)(D); or

   e. "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G).

"Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference as well as actual knowledge. 31 U.S.C. § 3729(b)(1). In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.

## V.    Factual Allegations

### A.  Defendants knowingly submitted claims for ineligible beneficiaries.

44. Defendants caused Lab Elite to submit claims for reimbursement to the HRSA Uninsured Program in the amount of $206,041,945.00. These claims resulted in the HRSA Uninsured Program issuing payment to Lab Elite in the amount of $83,578,387.89.

45. To secure the payments, Defendants caused Lab Elite to falsely attest that it had "checked for health care coverage eligibility and confirmed that the patient is uninsured, and does not have employer-sponsored or individual coverage …." Without this attestation, the HRSA Uninsured Program would not have reimbursed the claims. However, the overwhelming majority of the claims Defendants submitted to the HRSA Uninsured Program were for patients who had employer-sponsored health insurance. Defendants knew this because they secured access to the patients through the patient's employer.

46. Defendants' sales activities were not directed toward uninsured individuals but instead focused on employers. Examples of Defendants' marketing campaigns targeting employers include:

(i)    Defendant Healthcare Development Partners, LLC posted the following solicitation to its website: "It is your responsibility to keep your employees safe. Healthcare Development Partners, LLC has partnered with Lab Elite to be the premier provider of Covid-19 diagnostic testing through RT-PCR tests servicing the Healthcare and Senior Living Industry as well as other employers."

(ii)     Defendant Lab Elite's online test order form included the following instruction: "Please complete the form below to order Covid-19 tests for your team. Covid-19 tests are offered at NO COST to employers under the CARES Act."

(iii)    Defendant HDP Labs, LLC posted the following solicitation to their website: "Reduce the spread of Covid in your buildings by testing weekly with us. Covid-19 tests are provided for your residents or employees at no cost under the Cares Act."

Defendants approached employers directly and presented a consistent pitch: their message was (i) that employers should test their employees regularly; (ii) that other labs would do the testing but would require payment from the employer, employee, or the employee's insurance; and (iii) that Lab Elite would provide the testing at zero cost to the employer, the employee, and the employee's insurance.

47. Defendants explained their ability to provide zero cost testing by stating that they had access to federal funding, but they carefully avoided disclosing to clients that the funding came from the HRSA Uninsured Program. Instead, Defendants described their billing practices much more vaguely like: "billing reimbursement through the CARES Act"; "go[ing] through HRSA"; stating that the "CARES ACT GUARANTEES A PAYMENT SO WE GUARANTEE THE CLIENTS WILL NOT BE CHARGED" (emphasis in original). Prior to accepting employee specimens for testing, Defendants entered into agreements with employers that provided a carefully crafted (and misleading) description of the source of funding. This description was as follows:

> The Provider is entering into this Agreement based upon the US Department of Health and Human Services ("HHS") claim reimbursement program to health care providers at Medicare rates. This Agreement is subject to the continued existence of the HHS reimbursement program and the continued availability of program funding until May, 31st 2022. In the event the HHS' reimbursement program is discontinued or funding is no longer available, this Agreement shall be terminated

and the Provider will have no further obligation to provide the C19 Testing hereunder.

The "HHS reimbursement program" referenced in Defendants' contracts was actually the HRSA Uninsured Program. Between November 2020 and February 2022, approximately 97.9% of all the money reimbursed to Lab Elite came from the HRSA Uninsured Program, and Defendants did not receive substantial funds from any other federal program. However, Defendants misrepresented the nature of the Uninsured Program to their employer clients as one that reimbursed employers and insurance plans for expenses incurred in providing routine workplace Covid testing.

48. The confusion caused by Defendants' misrepresentations regarding the nature of their funding is apparent from the questions asked by Defendants' prospective corporate clients. On November 2, 2021, Pierre Azucenas, affiliated with prospective client Pepsi, wrote to Defendant LabCo Elite, asking:

> Will the group health plan that pays for the covered COVID-19 testing and related services get reimbursed get reimbursed for the service from the HHS, DOL or Treasury?
>
> If the group health plan is reimbursed for the covered COVID-19 testing and related services, will the reimbursement be for 100% of the cost or some other arrangement?

Similarly, on September 30, 2021, Kelly Taylor with Piper Jordan (a third-party administrator acting on behalf of prospective clients Dominoes and 99 Only) wrote to Defendant LabCo Elite asking:

> If the employer chooses to run this through their self-funded health plan and pays for the testing that way, how would they then submit through CARES for reimbursement or do you help facilitate that process?

After meeting with Defendants, prospective clients consistently believed that Defendants had access to federal funding that reimbursed employers and employer-funded insurance plans for costs incurred in connection with routine workplace testing even though no such funding existed.

49. Defendants' obfuscation of the source of their funding from clients was an important part of their scheme, which is illustrated by the instances where that obfuscation failed. Many prospective clients did not question Defendants' representations, but some did, and in multiple instances where Defendants were ultimately unable to conceal the source of their funding, prospective clients not only rejected Defendants' proposed arrangement but explicitly told Defendants that their billing practices were non-compliant. On November 22, 2021, Tabitha Fulst, an employee of the third-party administrator for prospective client, Molded Fiberglass Companies, wrote to Defendant LabCo Elite stating, "we are not at liberty to submit for reimbursement from the Cares Act." Similarly, in November of 2021, Defendants received notice from Pierre Azucenas, on behalf of prospective client Pepsi that "there is no reimbursement from the HHS to an employer group plan."

50. Defendants received and ignored multiple warnings that billing the HRSA Uninsured Program for employees with employer-sponsored health insurance was improper. They knew that their billing practices did not comply with federal law, but instead of changing those practices, Defendants concealed them.  Defendants focused on avoiding detection. In numerous communications, Defendants discussed the likelihood of detection of their billing practices. For example, on October 29, 2021, Defendant Roxanne Scavone replied to an October 27, 2021, LabCo Elite email requesting guidance on how to respond to opposition from a client's insurance provider regarding the proposed testing schedule and stated "How many employees are we talking? Zishan told me it would not be a red flag if we had many people say no insurance I would propose to go through HRSA." Similarly, on October 27, 2021, Defendant Roxanne Scavone wrote with respect to client BJs, "Also saying no insurance is not going to raise red flag. There's millions of tests getting billed this way. …" On September 30, 2021, Relator received an email from Heather

Harbach summarizing a call with Defendant Roxanne Scavone earlier that day and stating, "Roxanne and I spoke with Jordan Piper (3rd party HR vendor for Dominos and 99 Only) and it went great! Roxanne confirmed all the employees will be checking off \*no insurance\* because these companies pay for their own insurance. So essentially they would be paying for the testing since they do get billed in a way apparently...They feel the most comfortable doing this."

51. Regardless of whether the employees marked "insurance" or "no insurance" on their order forms, Defendants submitted the claims to the HRSA Uninsured Program. However, Defendants preferred that employees mark "no insurance" so if the employee's ineligibility were ever discovered and the records were ever audited, they could blame the employee and plead ignorance of the employee's insurance status. As a result, Defendants regularly encouraged employees not to enter their employer-sponsored health insurance. It is clear from Defendants' internal communications that this was a widespread practice. But Defendants were also acutely aware that instructing employees not to enter insurance information was fraudulent, and Defendant Zishan Alvi emphasized the importance of giving this instruction orally, not in writing. On November 16, 2021, Defendant Zishan Alvi wrote to Defendant Roxanne Scavone instructing her "YOU CANNOT TELL PATIENTS NOT ENTER INSURANCE IN WRITIING" (emphasis in original). The point of this instruction was not to stop the practice of telling patients not to enter insurance. That practice continued unabated. The point was not to make the instruction in writing because it was evidence of fraud.

52. Defendants targeted Union Beverage Packers, LLC, located in Hillside, New Jersey in the District of New Jersey. On or about November 29, 2021, Defendants caused Lab Elite to submit a batch of claims to the HRSA Uninsured Program which included claims for tests performed on the following Union Beverage employees: JD, SS, RM, AO, CP, MC, JC, and GL (collectively, the

"Union Beverage Employees"). Defendants knew that the Union Beverage Employees were insured and had previously instructed them not to provide insurance information. Defendants caused Lab Elite to falsely attest that it had "checked for health care coverage eligibility" of the patients identified, including the Union Beverage employees, and "confirmed that the patient[s] [are] uninsured, and do[] not have employer-sponsored or individual coverage."

53. For each of the Union Beverage Employees, Defendants also intentionally circumvented mechanisms that were intended to allow the HRSA Uninsured Program to identify claims for services to individuals who were not insured. Defendants made no attempt to collect and provide the patient SSN or alternative identification of the Union Beverage Employees and caused Lab Elite to falsely attest, on or about November 29, 2021, that it had attempted or did not have the opportunity to collect patient identification in order to receive reimbursement under the Uninsured Program.

**B.  *Defendants knowingly submitted claims for tests that were never performed.***

54. Many of the claims that Defendants caused to be submitted to the HRSA Uninsured Program were false because the tests were never performed. Defendants collected the test specimens, threw those specimens away, and reported that the test results were Covid negative.

55. On September 30, 2024, Defendant Zishan Alvi pleaded guilty to committing wire fraud and admitted to defrauding the HRSA Uninsured Program. Defendant Zishan Alvi admitted that, beginning in March of 2021 and continuing through January 2022, Defendant Zishan Alvi instructed co-conspirators to issue test results reporting that patients did not have Covid-19 when the tests were never performed.

56. Defendant Zishan Alvi has specifically admitted that, on or about December 24, 2021, he caused the submission of "a claim for a purported PCR test for Individual D.C. performed on

December 16, 2021, that was not performed as billed, which claim was processed through HRSA servers … At defendant's direction, the test specimen associated with Individual D.C. (among others) was not processed by [Lab Elite] but was nevertheless billed to HRSA as having been processed."

57. Defendant Zishan Alvi identified 85,066 unprocessed tests that were billed to HRSA in the three-week period between December 8, 2021, through December 26, 2021, and has "acknowledge[d] that, as a result of the scheme, HRSA paid at least approximately $14 million to [Lab Elite] for COVID-19 tests that were not performed as billed."

58. This more flagrant defrauding of the HRSA Uninsured Program was facilitated by and grew out of the Defendants' other misconduct. Defendants' fraudulent employee testing program resulted in Lab Elite receiving a large volume of specimens that were very likely to test negative: the tests were for employees that did not have Covid symptoms and did not have any known Covid exposure. Many had already been tested for Covid within the last week (along with all their coworkers). In short, Defendants were not testing these employees because anyone thought they might have Covid, but only as an excuse to bill the HRSA Uninsured Program. The employees expected negative results. The employer clients wanted negative results (so they could continue normal operations), and the Defendants determined that they could cut costs and increase their profits by reporting negative results without actually performing the tests. The claims submitted to the HRSA Uninsured Program were already fraudulent, so it was a small step for Defendants to release results and bill for tests that had not been run.

59. Defendants took action to conceal that tests were being reported without being processed. On October 27, 2021, Clients Red Robin and BJ's requested that Lab Elite provide photographic evidence of positive and negative test results in addition to posting results as "an additional

confirmation to make sure they are not false reporting." Defendant Roxanne Scavone refused this request stating, "no.. they're not going to review 40,000 photos of results. Unfortunately that is not realistic to open that many attachments while processing. … I did just texr [sic.] and ask though if they can 'upload picture of Positive test' only."

60. This proposed compromise was carefully calculated: when Defendants reported results without actually running the tests, they reported those results as negative. In those instances, Defendants could not easily produce photographic evidence confirming the test results they reported (the evidence did not exist). However, Defendants could produce photographic evidence supporting all of the positive tests since they did not fabricate positive results. By offering to upload photographic proof of positive results, Defendants could placate their clients' without incurring obligations that could expose the fabricated test results.

### C.  Defendants' claims resulted from the payment of illegal kickbacks.

61. Defendants secured $83,578,387.89 in payment from the HRSA Uninsured Program and Defendants Zishan Alvi and Todd Bryant caused substantial portions of that reimbursement to be paid in the form of illegal kickbacks to individuals that were in a position to arrange for employers and individuals to send large numbers of tests to Lab Elite, which Defendants then billed to the HRSA Uninsured Program.

62. Defendant Todd Bryant attempted to recruit Relator to join Defendants' conspiracy and was very direct in explaining that his fundamental goal was to pay for referrals. In November of 2021, Defendant Todd Bryant sent Relator a photo of a check made out to Bob Transportation and Taxi, Inc. in the amount of $390,805.00 and left Relator a voicemail stating, "Hey Crystal. Todd Bryant. That check is for a taxi driver … he does three to four hundred tests at each location … and that was a check for one week, last week, he made four hundred grand in one week, making a

million five, so I want to talk to you about it and, you know we've got to do everything, but there is never going to be an easier time to make money. Call me back …"

63. Defendant Todd Bryant operated Lab Elite's kickback network and was responsible for purchasing referrals on Lab Elite's behalf. Defendant Todd Bryant caused the formation of numerous shell companies for the purpose of distributing illegal kickbacks including, without limitation, Lab Dash, LLC, HDP Labs, LLC, and LabCo Elite, LLC. Filings made to the Illinois Secretary of State identified Defendant Todd Bryant as the registered agent with an address of 1000 South Rose Avenue, Park Ridge, IL 60068. This address is the personal residence of Defendant Nikola Nozinic.

64. Lab Dash, LLC, HDP Labs, LLC, and LabCo Elite, LLC all held themselves out as being in the business of "providing lab testing and sample processing services for SARS COVID-19." However, the shell companies were not licensed to provide lab testing and acted as contracting mechanisms for Lab Elite, Defendant Todd Bryant and his company Healthcare Development Partners, LLC. The shell companies were operated and controlled by employees of Healthcare Development Partners, LLC, including Defendant Roxanne Scavone.

65. Defendant Todd Bryant caused the shell companies to enter into Service Provider Referral Agreements with third party contractors who agreed to "refer potential clients ("Referrals") in need of Testing to LAB DASH in exchange for a commission on any revenue generated by LAB DASH as a result of such Testing." In exchange for the commission payments, each contractor agreed "that it shall not direct potential Testing customers to any competitor of Lab Dash and/or Lab Elite."

66. The referral agreements explicitly acknowledged that the commission payments were derived from federal payments stating "The Parties acknowledge and agree that they are entering

into this Agreement based upon the US Department of Health and Human Services ("HHS") claim reimbursement program to health care providers at Medicare rates. This Agreement is subject to the continued existence of the HHS reimbursement program and the continued availability of program funding." The referral agreements concealed the true source of funding for Defendants' lab operations but did acknowledge that the funds were federal in nature.

67. The payments described in the Service Provider Referral Agreements were explicitly payments for referrals, and nearly 100% of the time, those referrals resulted in federal claims to the HRSA Uninsured Program. The Service Provider Referral Agreement payments are precisely the type of payment that the AKS prohibits, and they resulted in exactly the harm that the AKS seeks to prevent – massive amounts of unnecessary services that harmed patients and resulted in millions of dollars in harm to federal healthcare programs.

**D. *Organizational Structure of the Conspiracy and Participation of the Defendants.***

68. Defendant Lab Elite, LLC – Lab Elite was the licensed laboratory which performed (or failed to perform) the laboratory tests that Defendants billed to the HRSA Uninsured Program. Defendants' false claims were submitted to the HRSA Uninsured Program on behalf of Lab Elite. Lab Elite received all payments from the Uninsured Program, and it is directly liable for the inaccuracy of all attestations made in connection with the submission of claims on its behalf. Defendant Lab Elite, LLC has received and retained substantial payments from the HRSA Uninsured Program that it knows to be the proceeds of false claims. Defendant Lab Elite, LLC has failed to return such funds, and instead, is knowingly and improperly avoiding its obligation to repay such money to the government.

69. Defendant Zishan Alvi – Along with Defendant Nikola Nozinic, Defendant Zishan Alvi co-owned and controlled the operations of Lab Elite. He authorized the submission of claims to

the HRSA Uninsured Program that he knew were for individuals with employer-sponsored insurance plans. He authorized the issuance of fabricated test results and the submission of claims to the HRSA Uninsured Program when he knew that the corresponding tests had never been processed. Defendant Zishan Alvi authorized the payment of kickbacks pursuant to the Service Provider Referral Agreements and authorized the submission of claims to the HRSA Uninsured Program that he knew resulted from the payment of illegal kickbacks.

70. Defendant Todd Bryant – Defendant Todd Bryant managed and controlled Lab Elite's kickback network, and both accepted and paid illegal kickbacks. He recruited sales contractors for Lab Elite with the promise of easy money in exchange for lab referrals. He formed several shell companies including LabCo Elite, LLC, HDP Labs, LLC, and Lab Dash, LLC for the purpose of entering into Service Provider Referral Agreements for the illegal purchase of laboratory referrals. He executed General Service Agreements with employers pursuant which he secured access to employees for Lab Elite to test on a weekly basis. Defendant Todd Bryant knew that claims for the tests he secured were submitted to the HRSA Uninsured Program, and that those tests were not eligible for reimbursement because the patients were insured, the tests were not performed, and the referrals were received as the result of illegal kickbacks. Defendant Todd Bryant directed employees of Healthcare Development Partners, LLC, including Defendant Roxanne Scavone, in carrying out the objectives of Defendants' conspiracy – in concealing the source of Lab Elite's reimbursement and avoiding disclosure of fabricated test results. Defendant Todd Bryant responded to compliance concerns raised by sales contractors and attempted to convince them that those concerns were unwarranted. Defendant Todd Bryant has received and retained millions of dollars from Lab Elite that he knows are proceeds of false claims submitted to the HRSA

Uninsured Program. Defendant Todd Bryant has failed to return such funds, and instead, is knowingly and improperly avoiding his obligation to repay such money to the government.

71.   Defendant Nikola Nozinic – Defendant Nikola Nozinic, along with Defendant Zishan Alvi co-owned and controlled the operations of Lab Elite. Defendant Nikola Nozinic knew of and approved the decisions to secure lab referrals by paying kickbacks to sales contractors and to submit claims for ineligible beneficiaries to the HRSA Uninsured Program. On multiple occasions Defendants Roxanne Scavone and Todd Bryant told Relator that Defendant Nikola Nozinic's approval was required or had been obtained. On or about July 22, 2021, Defendant Roxanne Scavone wrote to Relator stating that Defendant Nikola Nozinic, not Defendant Zishan Alvi, would approve the minimum employee number for companies outside of Illinois required to be accepted as a Lab Elite client.  Defendant Nikola Nozinic caused Defendant Todd Bryant to designate 1000 South Rose Avenue, Park Ridge, IL 60068 as the registered agent address for the kickback shell companies, which is the personal residence of Defendant Nikola Nozinic. Defendant Nikokla Nozinic signed the supplier authorization form to contract with Dole Fresh Vegetables, which secured for Lab Elite approximately 5,000 tests per month that were ineligible for submission to the HRSA Uninsured Program, but which were submitted to the HRSA Uninsured Program. Defendant Nikola Nozinic has received and retained millions of dollars from Lab Elite that he knows are proceeds of false claims submitted to the HRSA Uninsured Program. Defendant Nikola Nozinic has failed to return such funds, and instead, is knowingly and improperly avoiding his obligation to repay such money to the government, including, without limitation, by transferring assets used in the commission of the fraud to Trust Number 8002390557.

72. Defendant Roxanne Scavone – Defendant Roxanne Scavone acted at the direction of Defendant Zishan Alvi and Defendant Todd Bryant and served as a primary point of contact for

employer clients and sales contractors. Defendant Roxanne Scavone directed employee patients to conceal their insurance status on test order forms and assisted Lab Elite in concealing its fabrication of negative test results from employer clients. Defendant Roxanne Scavone accepted kickbacks. Defendant Roxanne Scavone has received and retained significant payments from Lab Elite, Defendant Todd Bryant and Defendant Healthcare Development Partners, LLC that she knows are proceeds of false claims submitted to the HRSA Uninsured Program. Defendant Roxanne Scavone has failed to return such funds, and instead, is knowingly and improperly avoiding her obligation to repay such money to the government.

73. Defendant Healthcare Development Partners, LLC – Defendant Healthcare Development Partners, LLC contracted with Lab Elite serve as its marketing arm and to secure Covid-19 tests for submission to the HRSA Uninsured Program. Defendant Healthcare Development Partners, LLC both received and paid kickbacks to secure Covid tests for Lab Elite. Agents and employees of Defendant Healthcare Development Partners, LLC, including Defendant Todd Bryant and Defendant Roxanne Scavone secured Covid-19 tests from employers that they knew were ineligible for reimbursement through the HRSA Uninsured Program and facilitated the submission of the false claims. Defendant Healthcare Development Partners, LLC caused its alter egos, including LabCo Elite, LLC, HDP Labs, LLC, and Lab Dash, LLC to enter into agreements which explicitly provided for contractors to "refer potential clients ("Referrals") in need of Testing …  in exchange for a commission on any revenue generated …." Defendant Healthcare Development Partners, LLC has received and retained substantial payments from Lab Elite known to be the proceeds of false claims submitted to the HRSA Uninsured Program. Defendant Healthcare Development Partners, LLC has failed to return such funds, and instead, is knowingly and improperly avoiding its obligation to repay such money to the government.

74. Defendants LabCo Elite, LLC, HDP Labs, LLC, and Lab Dash, LLC – Defendants LabCo Elite, LLC, HDP Labs, LLC, and Lab Dash, LLC are shell companies established by Defendant Todd Bryant for the purpose of paying kickbacks. Defendants LabCo Elite, LLC, HDP Labs, LLC, and Lab Dash, LLC have received and retained substantial payments from Lab Elite known to be the proceeds of false claims submitted to the HRSA Uninsured Program. Defendants LabCo Elite, LLC, HDP Labs, LLC, and Lab Dash, LLC have failed to return such funds, and instead, are knowingly and improperly avoiding their obligation to repay such money to the government. Defendants have caused each of these entities to be dissolved after Defendant Zishan Alvi's indictment resulting in the distribution of these entities' assets to their Defendant members.

75. Defendant Grand River Investments, LLC – Defendant Todd Bryant caused Defendant Grand River Investments, LLC to be a manager of Lab Dash, LLC and LabCo Elite, LLC.

76. Defendants, Babar Nasim, Moin Babar, and Bob Transportation and Taxi, Inc. – Defendants Babar Nasim and Moin Babar owned and operated Defendant Bob Transportation and Taxi, Inc. and caused Defendant Bob Transportation and Taxi, Inc. to accept illegal kickbacks in exchange for referring Covid-19 laboratory tests to Lab Elite, receiving approximately $390,805.00 per week. The tests that Defendant Bob Transportation and Taxi, Inc. caused to be referred to Lab Elite were submitted to the HRSA Uninsured Program despite being ineligible for reimbursement. Defendants Babar Nasim, Moin Babar, and Bob Transportation and Taxi, Inc. have received and retained substantial payments from Lab Elite known to be the proceeds of false claims submitted to the HRSA Uninsured Program. Defendants Babar Nasim, Moin Babar, and Bob Transportation and Taxi, Inc. have failed to return such funds, and instead, are knowingly and improperly avoiding their obligation to repay such money to the government.

## VI.    Conditions Precedent

77. All conditions precedent to filing suit have been performed or waived.

78. The specific facts and circumstances alleged in this Complaint have not been publicly disclosed: (a) in a federal criminal, civil, or administrative hearing in which the U.S. Government or its agent is a party; (b) in a Congressional, Government Accountability Office, or other U.S. Government report, hearing, audit, investigation; or (c) to the news media.

79. To the extent any Court determines that a public disclosure has taken place, Relator is an original source of the information upon which this Complaint is based, as that term is defined in 31 U.S.C. § 3730(e)(4)(B).

## VII.    Claims

### Count I: Violations of 31 U.S.C. § 3729(a)(1)(A)

80. Relator re-alleges Paragraphs 1 through 79.

81. Based on the foregoing allegations, each of the Defendants have knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

82. The United States Government, or its authorized agent, unaware of the falsity of the claims presented by Defendants, paid the false claim, and as a result, the Government has suffered monetary damages in excess of $30,000,000.00.

### Count II: Violations of 31 U.S.C. § 3729(a)(1)(B)

83. Relator re-alleges Paragraphs 1 through 79.

84. Based on the foregoing allegations, each of the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

85. The United States Government, or its authorized agent, unaware of the falsity of the claims presented by Defendants, paid the false claim, and as a result, the Government has suffered monetary damages in excess of $30,000,000.

## Count III: Violations of 31 U.S.C. § 3729(a)(1)(C)

86. Relator re-alleges Paragraphs 1 through 79.

87. Based on the foregoing allegations, each of the Defendants has conspired to commit a violation of subparagraphs (A), (B), and (G) in violation of 31 U.S.C. § 3729(a)(1)(C).

88. The United States Government, or its authorized agent, unaware of the falsity of the claims presented by Defendants, paid the false claim, and as a result, the Government has suffered monetary damages in excess of $30,000,000.

## Count IV: Violations of 31 U.S.C. § 3729(a)(1)(D)

89. Relator re-alleges Paragraphs 1 through 79.

90. Based on the foregoing allegations, each of the Defendants has possession, custody, or control of property or money used, or to be used, by the Government and has knowingly delivered, or caused to be delivered, less than all of that money or property in violation of 31 U.S.C. § 3729(a)(1)(D).

91. As a result of this failure, the Government has suffered monetary damages in excess of $30,000,000.

## Count V: Violations of 31 U.S.C. § 3729(a)(1)(G)

92. Relator re-alleges Paragraphs 1 through 79.

93. Based on the foregoing allegations, each of the Defendants has knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, and has knowingly concealed and knowingly and

improperly avoided and decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

94. The United States Government, or its authorized agent, unaware of the falsity of the claims presented by Defendants, paid the false claim, and as a result, the Government has suffered monetary damages in excess of $30,000,000.

**Count VI: Liability Under 31 U.S.C. § 3729 Arising Under 42 U.S.C. § 1320a-7b(g)**

95. Relator re-alleges Paragraphs 1 through 79.

96. Based on the foregoing allegations, each of the Defendants has knowingly offered, paid, solicited, and/or received remuneration directly or indirectly in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program and in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

97. This conduct constitutes a violation under 42 U.S.C. § 1320a-7b(b)(1) and (2). "A claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" 31 U.S.C. § 3729 per 42 U.S.C. § 1320a-7b(g). As a result, all claims submitted by Defendants were false and fraudulent.

98. The United States Government, or its authorized agent, unaware of the falsity of the claims presented by Defendants, paid the false claim, and as a result, the Government has suffered monetary damages in excess of $30,000,000.00.

## VIII.   Request for Trial by Jury

99. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby requests trial by jury.

## IX.   Prayer for Relief

Relator, on behalf of herself and the United States, requests that judgment be entered in her favor and against Defendants in an amount determined under the FCA equal to three times the damages sustained by the federal government and the Uninsured Program because of the Defendants' actions, and a civil penalty of $11,000.00 for each false claim submitted in violation of the FCA, and all attorneys' fees, expenses and any other costs of bringing this civil action as described under 31 U.S.C. § 3729(a)(3). Relator, on behalf of herself and the United States, requests such other and further relief as the Court deems just and proper.

Dated: January 12, 2026.

Respectfully submitted,

**QUINLAN LAW, PLLC**
Lead Counsel

*/s/ Christopher Quinlan*
Christopher Quinlan (PHV)
1765 Mapleton Drive
Dallas, TX 75228
(214) 454-6376
(214) 646-0629
chris@lawquinlan.com

**BROWN, LLC**
Local Counsel

*/s/ Jason T. Brown*
Jason T. Brown (NJ 035921996)
111 Town Square Place, Suite 400
Jersey City, NJ 07310
(877) 561-0000
(855) 582-5297 (fax)
jtb@jtblawgroup.com

*Attorneys for Relator Crystal McKinsey*